In re OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010.

Applies to: 10–2771, 10–4536, and All Cases.

MDL No. 2179.

United States District Court, E.D. Louisiana.

Jan. 26, 2012.

990

R. Michael Underhill, U.S. Department of Justice, San Francisco, CA, David Joseph Pfeffer, Jessica Langston McClellan, Jessica G. Sullivan, Judy B. Harvey, Michelle T. Delemarre, Peter F. Frost, Sharon K. Shutler, Stephen G. Flynn, Steven O'Rourke, U.S. Department of Justice, Washington, DC, Sharon Denise Smith, U.S. Attorney's Office, New Orleans, LA, for Plaintiff.

Deborah Deroche Kuchler, Janika D. Polk, Robert Edward Guidry, Kuchler Polk Schell Weiner & Richeson, LLC, Edward F. Kohnke, IV, Preis & Roy, PLC, Kerry J. Miller, Frilot L.L.C., Richard Nelson Dicharry, Evans Martin McLeod, Marne Jones, Phelps Dunbar, LLP, New Orleans, LA, David B. Salmons, Ky E. Kirby, Michael B. Wigmore, Randall M. Levine, Sandra Franco, Warren Anthony Fitch, Bingham McCutchen, LLP, Washington, DC, James J. Dragna, Bingham McCutchen, LLP, Christopher McNevin, Pillsbury, Winthrop, Shaw, Pittman, LLP, Allen M. Katz, Brad Brian, Munger, Tolles & Olson, LLP, Los Angeles, CA, John F.

Pritchard, Edward Flanders, Pillsbury, Winthrop, Shaw, Pittman, LLP, New York, NY, Steven Roberts, Kent C. Sullivan, Rachel G. Clingman, Teri L. Donaldson, Sutherland, Asbill & Brennan, LLP, Daniel O. Goforth, Goforth Geren Easterling LLP, John M. Elsley, Royston, Rayzor, Vickery & Williams, LLP, Houston, TX, Edwin G. Preis, Jr., Preis & Roy, PLC, Lafayette, LA, Kyle S. Moran, Phelps Dunbar, LLP, Gulfport, MS, for Defendants.

Don Keller Haycraft, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA, Brian D. Israel, Arnold & Porter, LLP, Jeffrey Bossert Clark, Robert R. Gasaway, Kirkland & Ellis, LLP, Joel M. Gross, Arnold & Porter, LLP, Robert C. Mike Brock, Covington & Burling LLP, Washington, DC, J. Andrew Langan, Richard C. Godfrey, Kirkland & Ellis, LLP, Chicago, IL, for Third Party Plaintiff.

David J. Beck, David W. Jones, Geoffrey Gannaway, Joe W. Redden, Jr., Beck, Redden & Secrest, LLP, Jerry C. Von Sternberg, Misty Hataway-Cone, Robert Alan York, Godwin Ronquillo PC, Houston, TX, Carmelite M. Bertaut, Jared A. Davidson, Keith B. Hall, Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann, LLC, New Orleans, LA, Donald E. Godwin, Bruce W. Bowman, Floyd R. Hartley, Jr., Gavin E. Hill, Jenny L. Martinez, Godwin Ronquillo PC, Dallas, TX, for Third Party Defendant.

Douglas Conrad Longman, Jr., Gary Jude Russo, Jones Walker, Michael Gerard Lemoine, Longman Russo, APLC, Lafayette, LA, Glenn Gill Goodier, Lance Michael Sannino, Richard D. Bertram, Jones Walker, New Orleans, LA, for Cross Claimant.

Hugh E. Tanner, Denise U. Scofield, Morgan, Lewis & Bockius, Houston, TX, Derek E. Leon, Morgan, Lewis & Bockius, Miami, FL, Philip D. Nizialek, M. Hampton Carver, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, New Orleans, LA, Jack McKay, Pillsbury, Winthrop, Shaw, Pittman, LLP, Washington, DC, for Cross Defendant.

Eric E. Huber, Eric E. Huber, Attorney at Law, Boulder, CO, Devorah Ancel, Sierra Club, San Francisco, CA, for Movant.

## ORDER AND REASONS

**[As to Transocean and BP's Cross–Motions for Partial Summary Judgment Regarding Indemnity]**

BARBIER, District Judge.

Before the Court are Transocean's Motion for Partial Summary Judgment (Rec. Doc. 4477) and BP's[1] Cross–Motion for Partial Summary Judgment (Rec. Doc. 4827) as to whether BP must defend and indemnify Transocean for pollution claims asserted by third parties.[2] For reasons explained below, both Motions are GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND AND PARTIES' ARGUMENTS

This Multi-district Litigation ("MDL") arises from the April 20, 2010 explosion

1. Transocean's Motion was filed by Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH, collectively referred to as "Transocean." BP's Motion was filed by BP American Production Co., BP Exploration & Production, Inc., and BP p.l.c., collectively referred to as "BP."

2. The United States and BP filed oppositions to Transocean's motion, which appear at Record Documents 4840 and 4826, respectively. Transocean's replies to the United States and BP appear at Record Documents 4862 and 4867. BP's reply in support of its Cross–Motion appears at Record Document 4931.

and fire on the DEEPWATER HORIZON mobile offshore drilling unit ("MODU"), and the subsequent discharge of millions of gallons of oil into the Gulf of Mexico. The consolidated cases include claims for the death of eleven individuals, numerous claims for personal injury, and various claims for environmental and economic damages.

Two member cases provide the context for the instant Motions. The first, *In re Triton Asset Leasing GmbH, et al.*, No. 10–2771 (the "Limitation Action"), was instituted by Transocean, as owner of the DEEPWATER HORIZON, pursuant to the Limitation of Shipowners' Liability Act, 46 U.S.C. § 30501, *et seq.*; Fed. R.Civ.P. Supp. R.F. Numerous claims were asserted in the Limitation Action against Transocean for personal injury, wrongful death, economic loss, property damage, etc. Transocean, in turn, impleaded BP (and other parties not relevant here) under Fed.R.Civ.P. 14(c), tendering BP to the claimants and demanding judgment in the claimants' favor. (Rec. Doc. 1320). BP and Transocean then cross-claimed against one another, each seeking contribution, indemnity, and affirmative damages from the other for certain liabilities resulting from the casualty. (Rec. Docs.2068, 2074).

In the second case, *United States v. BP Exploration & Prod. Inc., et al.*, No. 10–4536 (the "United States' Action"), the United States asserted claims for civil penalties under Section 311(b)(7) of the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7), and a declaration of liability for removal costs and damages under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, et seq. BP and Transocean

were named as defendants (along with other parties not relevant here), who cross-claimed against each other, similar to what occurred in the Limitation Action. (Rec. Docs.2075, 2574).

Transocean's Motion for Partial Summary Judgment asserts that the contract between BP and Transocean ("the Drilling Contract") requires BP to defend and indemnify Transocean from claims and liabilities[3] related to pollution originating below the surface of the water, even if Transocean is strictly liable or the pollution was caused by Transocean's negligence or gross negligence. Transocean asserts that the scope of BP's indemnity obligation extends to compensatory damages, punitive damages, and statutory penalties. However, Transocean admits that the Drilling Contract does not provide indemnity in the event of intentional or willful misconduct in excess of gross negligence. (Transocean's Reply to U.S. p. 1, Rec. Doc. 4862 at 2).

BP filed a Cross–Motion for Partial Summary Judgment on this issue. BP does not contest that the Drilling Contract requires BP to indemnify Transocean for some claims, but disputes the scope of indemnity. BP admits that the contract requires it to indemnify Transocean for pollution claims arising from Transocean's "fault or negligence," but denies that it owes indemnity for claims based on strict liability—such as a claim for unseaworthiness or under OPA or the CWA—or where Transocean acted with gross negligence. Furthermore, and in any respect, BP argues that even if Transocean's interpretation of the contract is correct, public policy prohibits and invalidates a contractual indemnity that purports to include gross negligence, punitive damages, or CWA civil penalties.[4] BP also asserts that the

---

**3.** When this Order uses the term "claims" or "liabilities," etc., it refers to all types of claims including fines, penalties, compensatory damages, and punitive damages.

**4.** The United States joins BP in the argument that CWA penalties cannot be shifted by contractual indemnity.

indemnity clause is void if Transocean breached the Drilling Contract or materially increased risks to BP.

Finally, the parties dispute the extent of BP's obligations under the contractual duty to defend.

## II. SUMMARY JUDGMENT STANDARD

■ Summary judgment is appropriate when "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). "A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by[ ] citing to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answer, or other materials. . . ." Fed.R.Civ.P. 56(c)(1). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one that the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir.1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324, 106 S.Ct. 2548. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325, 106 S.Ct. 2548; *Little*, 37 F.3d at 1075.

## III. DISCUSSION

■ Interpretation of the terms of a contract is a matter of law, *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 956 (5th Cir.1984), and "[t]he determination as to whether defense or indemnification is due must be made at the outset of the litigation by reference solely to the relevant pleadings and pertinent contractual provisions." *In re TT Boat Corp.*, Nos. 98–0494, 98–1109, 1999 WL 1442054 at *6 (E.D.La. Sept. 8, 1999) (citations and quotations omitted); *In re Torch, Inc.*, No. 94–2300, 95–1982, 1996 WL 185765 *9 (E.D.La. April 16, 1996) (citations and quotations omitted). Accordingly, at this time

the Court addresses only whether and to what extent Transocean has an enforceable claim to contractual indemnity and defense from pollution liabilities. The Court does not consider other, factually-dependant issues.[5]

## A. *Interpretation of the Drilling Contract*

■ The parties agree that maritime law governs the Drilling Contract. Under maritime law, "an indemnity agreement ... should be read as a whole and its words given their plain meaning unless the provision is ambiguous. Disagreement as to the meaning of a contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties." *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir.2009) (citations and quotations omitted). Furthermore,

A contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage. Thus, for example, it is widely held that a contract of indemnity will not afford protection to an indemnitee against the consequences of his own negligent act unless the contract clearly expresses such an obligation in unequivocal terms.

*Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. Unit A 1981) (citations omitted).

In 1998, predecessors to BP and Transocean entered into the Drilling Contract, wherein Transocean agreed to build a MODU—what would become the DEEPWATER HORIZON—which BP agreed to hire in order to conduct drilling activities on the outer continental shelf. As frequently occurs in this context,[6] the Drilling Contract contained several indemnity clauses which required a party to bear the risk of a certain liability, and defend, indemnify, and release the other party from claims associated with that risk. In particular, Articles 24.1 and 24.2 (both reproduced below) addressed pollution risks. Then, Article 25.1 (also reproduced below) broadly defined the scope of the indemnity obligation. At issue is whether Article 25.1's indemnity obligation is fully incorporated into Article 24.2, or whether the indemnity obligation in Article 24.2 is "specifically limited to certain causes."

Generally speaking, Article 24.1 allocated to Transocean the risk associated with pollution "originating on or above the surface of the ... water." Article 24.2 allocated to BP the pollution risk "not assumed by" Transocean; i.e, pollution originating beneath the water's surface. Per the Drilling Contract (bold and italics added):

24.1 *CONTRACTOR [Transocean] RESPONSIBILITY*

[Transocean] SHALL ASSUME FULL RESPONSIBILITY FOR AND *SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD [BP] AND*

---

**5.** For example, although the issue of whether Transocean may be indemnified for its own gross negligence is discussed, the Court does not express an opinion as to whether Transocean's conduct was, in fact, grossly negligent (or merely negligent, or not negligent). *See*

Order of Nov. 16, 2011, Rec. Doc. 4618; *In re TT Boat Corp.*, 1999 WL 1442054 at *6 & n. 1.

**6.** *See generally* Daniel B. Shilliday et al., *Contractual Risk–Shifting in Offshore Energy Operations*, 81 Tul. L.Rev. 1579 (2007).

*ITS JOINT OWNERS HARMLESS* FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND, OR LIABILITY *FOR POLLUTION OR CONTAMINATION,* INCLUDING CONTROL AND REMOVAL THEREOF, *ORIGINATING ON OR ABOVE THE SURFACE OF THE LAND OR WATER,* FROM SPILLS, LEAKS, OR DISCHARGES OF FUELS, LUBRICANTS, MOTOR OILS, PIPE DOPE, PAINTS, SOLVENTS, BALLAST, AIR EMISSIONS, BILGE SLUDGE, GARBAGE, OR ANY OTHER LIQUID OR SOLID WHATSOEVER IN POSSESSION AND CONTROL OF [Transocean] AND WITHOUT REGARD TO NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD TO WHETHER THE SPILL, LEAK, OR DISCHARGE IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR OTHER FAULT OF [BP], ITS CONTRACTORS, (OTHER THAN [Transocean]) PARTNERS, JOINT VENTURERS, EMPLOYEES, OR AGENTS. IN ADDITION TO THE ABOVE, [Transocean] TO A LIMIT OF FIFTEEN MILLION DOLLARES (US$ 15,000,-000.00) PER OCCURANCE, SHALL RELEASE INDEMNIFY AND DEFEND [BP] FOR CLAIMS FOR LOSS OR DAMAGE TO THIRD PARTIES ARISING FROM POLLUTION IN ANY WAY CAUSED BY THE DRILLING UNIT WHILE IT IS OFF THE DRILLING LOCATION, WHILE UNDERWAY OR DURING DRIVE OFF OR DRIFT OFF FROM THE DRILLING LOCATION.

24.2 *COMPANY [BP] RESPONSIBILITY*

[BP] SHALL ASSUME FULL RESPONSIBILITY FOR AND *SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD [Transocean] HARMLESS* FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND, OR LIABILITY *FOR POLLUTION OR CONTAMINATION,* INCLUDING CONTROL AND REMOVAL THEREOF, ARISING OUT OF OR CONNECTED WITH OPERATIONS UNDER THIS CONTRACT HEREUNDER AND *NOT ASSUMED BY [Transocean]* IN ARTICLE 24.1 ABOVE, WITHOUT REGARD FOR NEGLIGENCE OF ANY PARTY OR PARTIES AND *SPECIFICALLY WITHOUT REGARD FOR WHETHER THE POLLUTION OR CONTAMINATION IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF [Transocean].*

As mentioned, Article 25.1 then broadly defines the scope of indemnity, which applies to the other indemnity clauses whenever the phrase "shall protect, release, defend, indemnify and hold harmless" appears, "except to the extent any such obligation is specifically limited to certain causes":

25.1 *INDEMNITY OBLIGATION*

*EXCEPT TO THE EXTENT ANY SUCH OBLIGATION IS SPECIFICALLY LIMITED TO CERTAIN CAUSES ELSEWHERE IN THIS CONTRACT,* THE PARTIES INTEND AND AGREE THAT *THE PHRASE "SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS" MEANS* THAT THE INDEMNIFYING PARTY SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE INDEMNIFIED PARTY OR PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES (INCLUDING

REASONABLE ATTORNEYS FEES), JUDGMENTS AND AWARDS OF ANY KIND OR CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING PREEXISTING CONDITIONS, WHETHER SUCH CONDITIONS BE PATENT OR LATENT, THE *UNSEAWORTHINESS OF ANY VESSEL* OR VESSELS (INCLUDING THE DRILLING UNIT), BREACH OF REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, *BREACH OF CONTRACT, STRICT LIABILITY,* TORT, *OR THE NEGLIGENCE OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY, WHETHER SUCH NEGLIGENCE BE* SOLE, JOINT OR CONCURRENT, ACTIVE, PASSIVE OR *GROSS* OR ANY OTHER THEORY OF LEGAL LIABILITY AND WITHOUT REGARD TO WHETHER THE CLAIM AGAINST THE INDEMNITEE IS THE RESULT OF AN INDEMNIFICATION AGREEMENT WITH A THIRD PARTY.

Although Article 24.2 contains the "shall protect, . . ." language that triggers Article 25. 1, BP's contention is that the last clause in Article 24.2 ("specifically without regard for whether the pollution or contamination is caused in whole or in part by the negligence or fault of [Transocean]") limited its indemnity obligation to instances where subsurface pollution is caused by Transocean's "negligence or fault;" i.e., Transocean's ordinary negligence. According to BP, the inclusion of "negligence or fault" in Article 24.2 excludes from the indemnity losses resulting from other causes, such as gross negligence and strict liability. BP characterizes Article 25.1 as a "fallback" definition, which applies *"except* to the extent any such [indemnity] obligation is specifically limited to certain causes elsewhere in this contract."

Transocean argues that Article 25.1's broad indemnity coverage applies to Article 24.2, because Article 24.1 did not "specifically limit[ ]" indemnity coverage to certain causes after it used the phrase "shall protect, . . . ." Transocean contends that the Drilling Contract made it clear when the indemnity obligation was specifically limited to certain causes, such as in Articles 22.3 and 23.1 (bold and italics added):

22.3 *[Transocean's]* IN HOLE–EQUIPMENT

[First paragraph omitted]

[BP] SHALL ASSUME THE RISK OF LOSS FOR AND PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS CONTRACTOR FOR DAMAGE TO OR DESTRUCTION OF CONTRACTOR'S CHOKE MANIFOLDS, BLOWOUT PREVENTORS, AND DRILL STRING CAUSED BY EXPOSURE TO UNUSUALLY CORROSIVE OR OTHERWISE DESTRUCTIVE ELEMENTS NOT NORMALLY ENCOUNTERED WHICH ARE INTRODUCED INTO THE DRILLING FLUID FROM SUBSURFACE FORMATIONS OR THE USE OF CORROSIVE ADDITIVES IN THE FLUID, *UNLESS* **SAID LOSS OF OR DAMAGE IS A RESULT OF [Transocean's] NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT** IN WHICH CASE [Transocean] IS SOLELY RESPONSIBLE FOR ALL LOSS OR DAMAGE.

. . .

23.1 *LOSS OR DAMAGE TO THE HOLE*

SHOULD THE HOLE BE LOST OR DAMAGED, THE LOSS OR DAMAGE WILL BE BORNE BY [BP] AND [BP] SHALL PROTECT, RELEASE, DE-

FEND, INDEMNIFY, AND HOLD HARMLESS [Transocean] FROM AND AGAINST ALL CLAIMS FOR LOSS OF OR DAMAGE TO THE HOLE. *NOTWITHSTANDING THE PREVIOUS SENTENCE,* IF THE HOLE IS LOST OR DAMAGED DUE TO [Transocean's] NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR ITS AGENTS', OR SUBCONTRACTORS OR THEIR FAILURE TO COMPLY WITH [BP's] INSTRUCTIONS, THEN AS [Transocean's] SOLE LIABILITY, [Transocean] SHALL BE OBLIGATED AT [BP's] ELECTION TO REDRILL THE HOLE TO THE POINT AT WHICH THE HOLE WAS LOST AT EIGHTY PERCENT (80%) OF THE OPERATING RATE BUT OTHERWISE SUBJECT TO THIS DRILLING CONTRACT.

After considering the language of the contract and the applicable law, the Court finds that Article 24.2 does not specifically limit the application of Article 25.1. Article 25.1 establishes a rule for interpreting the other indemnity Articles: where the phrase "shall protect, release, defend, indemnify and hold harmless" appears, Article 25.1 applies, *"except* to the extent any such obligation is *specifically limited* to certain causes." In other words, Article 25.1 is itself a clear and unequivocal agreement to provide its broad indemnity coverage whenever the triggering phrase "shall protect, ..." appears. Moreover, if the triggering phrase appears, the "except ... specifically limited ..." clause establishes that equally clear language is required to restrict Article 25.1's broad indemnity coverage. As Transocean points out, Articles 22.3 and 23.1 initially invoke Article 25. 1, but then use "unless" and "notwithstanding the previous sentence" to specifically limit Article 25.1's coverage. Contrariwise, Article 24.2 contains the phrase triggering Article 25.1, but does not contain language that "specifically limit[s]" Article 25.1's application. This indeed shows that when the parties intended to "specifically limit[ ]" Article 25. 1, they made their intent clear.

The Court interprets Article 24.2's phrase, "without regard for the negligence of any parties and specifically without regard for whether the pollution or contamination is caused in whole or in part by the negligence or fault of [Transocean]," as merely emphasizing that BP assumed the risk of subsurface pollution, even if said pollution was caused by Transocean's negligent conduct. However, this language does not reflect an intent to "specifically limit[ ]" Article 25.1's application, and thus is not interpreted as excluding gross negligence, strict liability, or other causes or damages listed in Article 25.1. This interpretation is consistent with Article 24.2's requirement that BP will assume *"any* loss, damage, expense, claim, fine, penalty, demand, or liability for pollution or contamination ... not assumed by [Transocean] in Article 24.1 above." (emphasis added).

Absent language that specifically limited Article 25. 1, it "reasonably appear[s] to have been within the contemplation of the parties," or, it can be "reasonably inferred that the parties intended," that Article 25.1 would be fully incorporated into Article 24.2. *Corbitt,* 654 F.2d at 333. Notwithstanding this interpretation, however, Transocean is not legally entitled to indemnity for the full range of liabilities listed in Article 25. 1, as explained below.

**B. *Public Policy and Indemnification for Gross Negligence, Punitive Damages***

Article 25.1 expressly requires indemnification for liabilities caused by the in-

demnitee's gross negligence (bold and italics added):

> ... THE INDEMNIFYING PARTY SHALL ... INDEMNIFY ... THE INDEMNIFIED PARTY OR PARTIES FROM AND AGAINST ANY AND ALL CLAIMS ... WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING ... THE NEGLIGENCE OF ... THE INDEMNIFIED PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR ... ***GROSS*** ....

Nevertheless, BP argues that an indemnity clause purporting to include gross negligence is void as against public policy.

At the outset, it is noted that terminology can cloud this issue. For example, courts and contracts sometimes broadly use the term "indemnity" to refer to a contract whereby one party agrees in advance to release the other contracting party from liability in the event the former party is damaged. Though other names are applicable,[7] the Court will refer to such a clause as a "release." *See, e.g., Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 507–08 (Tex.1993) (Texas law) (contrasting a release with an indemnity, and explaining, "In general, a release surrenders legal rights or obligations between the parties to an agreement ..." (citation omitted)). As distinguished from a release, a true "indemnity" agreement determines which party to a contract will ultimately bear the risk of injury to a ***third*** party. *See St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply, Inc.,* 409 F.3d 73, 86 (2d Cir.2005) (New York law) ("It is important, however, to distinguish between ... exculpatory clauses [i.e., releases] and indemnity clauses that simply shift the source of compensation without

restricting the injured party's ability to recover." (quotations and citations omitted)); Shilliday et al., *supra* note 6, at 1629. Given these differences, a release implicates different policy concerns than an indemnity, as discussed below. Although Articles 24.2 and Articles 25.1 operate both as a release and an indemnity, what is at issue is indemnity.

As to the issue of whether public policy prohibits a party from being indemnified for its own gross negligence, the parties have not cited to, and the Court has not found, a controlling case. Admittedly, *Becker v. Tidewater, Inc.,* 586 F.3d 358, 367 (5th Cir.2009), contains language that could easily be understood as establishing a prohibition against indemnification for gross negligence. There the Fifth Circuit stated:

> ***It is undisputed*** that Baker escapes indemnity if Tidewater's actions leading to Seth's injuries were grossly negligent. *See Houston Exploration Co. v. Halliburton Energy Servs., Inc.,* 269 F.3d 528, 531 (5th Cir.2001) (noting that a waiver of liability for gross negligence is void).

*Id.* at 367 (emphasis added). In that case, Tidewater sought contractual indemnity from Baker for the personal injury claims of Seth Becker. Baker sought to defeat the indemnity claim on the grounds that Tidewater was grossly negligent. The court held Tidewater was not grossly negligent and enforced the indemnity.

However, it appears that gross negligence was at issue in *Becker* simply because the indemnity clause did not purport to include gross negligence. The indemnity clause stated:

> *Universal Builders Supply, Inc.,* 409 F.3d 73, 86 (2d Cir.2005).

---

7. Other courts have referred to such agreements as an "exculpatory clause," for example. *See St. Paul Fire & Marine Ins. Co. v.*

[Baker shall indemnify Tidewater for] injury to, illness or death of the personnel or employees of [Baker], . . . however said injury, illness or death arises or occurs, whether through the negligence in whole or in part of any of [Tidewater], unseaworthiness of any vessel or otherwise; and [Baker] shall protect, defend, indemnify, and hold harmless [Tidewater] from and against all claims, suits, losses, liabilities, expenses, demands, costs (including reasonable attorneys' fees) and/or damages as a result of such illness, injury, or death.[8]

Pre-*Becker* decisions from this ·Court have held that indemnification will not extend to gross negligence if gross negligence is not expressly included in the agreement. *See In re TT Boat Corp.*, Nos. 98–0494, 98–1109, 1999 WL 1442054 at *6 (E.D.La. Sept. 8, 1999); *In re Torch, Inc.*, Nos. 94–2300, 95–1982, 1996 WL 185765 at *9 (E.D.La. April 16, 1996). The appellate briefs reflect that the court adopted this reasoning during an earlier appeal when it concluded that Baker's indemnity obli-

gation did not extend to gross negligence.[9] Likewise, the *Becker* opinion makes no mention of the public policy argument. Thus, it appears that it was "undisputed" that Baker would "escape[ ] indemnity" because the indemnity clause did not include gross negligence, not because public policy prohibits such indemnification.

*Becker's* citation to *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir.2001), with the explanatory parenthetical, "noting that a waiver of liability for gross negligence is void," causes pause, since a citation to previous authority might suggest a legal prohibition against indemnification for gross negligence. However, *Houston Exploration* did not concern a true indemnity claim; rather, it involved a contractual "release" from liability for damage suffered by the other party to the contract. Along these lines, when the Houston Exploration court stated, "Any waiver of liability for intentional misconduct or gross negligence . . . is void," it cited Louisiana Civil Code Article 2004 and a Louisiana case. *Id.* at

---

**8.** Reproduced from the district court's opinion, *Becker v. Tidewater, Inc.*, No. 99–1198, 2007 WL 3231655 at *3 (W.D.La. Nov. 14, 2007).

**9.** *See, e.g.*, Br. of *Baker Hughes, et al.*, 2008 WL 7295642 at *29 ("In *Becker I*, this Court expressly required determination of the defendants' potential gross negligence at the retrial of this matter. This issue arose during the first appeal with regard to Baker's argument that *because gross negligence was not expressly included within the scope of the Charter's indemnity provision,* Baker could not be required to indemnify Tidewater for Tidewater's own gross negligence. This Court's directive to the district court to consider "proof of gross negligence" was an acknowledgment that Tidewater's gross negligence, if found, would vitiate Baker's indemnity obligations under the language of the Charter. [In footnote:] Its reasoning is supported by the well-settled rule that indemnity for gross negligence will not be enforced *unless it is express-*

*ly set forth in the indemnity agreement at issue."* (footnote and citations omitted)); *see also* Br. of *Baker Hughes, et al.*, 2002 WL 32180622 at *3, *44 (urging during the first appeal in *Becker* that the contract "is silent as to Baker's obligation to indemnify for Tidewater's gross negligence"); Br. of *Tidewater Inc., et al.*, 2002 WL 32180622 (framing the issue during the first appeal in *Becker* as "Did the district court err in enforcing the indemnity clause where (1) the expert testified that his descriptive use of the term gross negligence was not intended to convey a legal standard, and (2) Baker failed to present evidence from the expert after being invited to do so by the district court?"); Br. of *Tidewater, Inc., et al.*, 2008 WL 7295644 (arguing on third appeal in *Becker* that the district court's holding that Tidewater was not grossly negligent was not erroneous); Br. of *Seth Becker*, 2008 WL 7295643 (arguing on third appeal that Tidewater was grossly negligent; no discussion of why such a holding would affect the indemnity agreement).

311 n. 6.[10] Civil Code Article 2004 states, in pertinent part, "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage *to the other party*." La. Civ.Code art. 2004 (emphasis added). Revision Comment (e) to Article 2004 adds, "This Article does *not* govern 'indemnity' clauses, 'hold harmless' agreements, or other agreements where parties allocate between themselves, the risk of potential liability towards third persons." (emphasis added). The Louisiana case cited in *Houston Exploration* similarly concerns a release, not an indemnity. *See Sevarg Co., Inc. v. Energy Drilling Co.,* 591 So.2d 1278 (La.App. 3 Cir.1991). Thus, although *Houston Exploration* makes clear that gross negligence will invalidate a *release,* the case does not stand for the proposition that public policy prohibits *indemnification* for gross negligence.

In *Todd Shipyards Corp. v. Turbine Service, Inc.,* the Fifth Circuit stated, "Gross negligence, which will invalidate an exemption from liability has been defined as '. . . harm wilfully inflicted or caused by gross or wanton negligence.'" 674 F.2d 401, 411 (5th Cir.1982) (citing 6A Corbin on Contracts § 1472 (1964)). Similar to *Houston Exploration,* however, *Todd Shipyards* dealt with a release found in a ship repair contract between a vessel owner and a shipyard, not a true indemnity. *See also Royal Ins. Co. of Am. v. Southwest Marine,* 194 F.3d 1009, 1016 (9th Cir.1999) (holding a release is invalid as to gross negligence, reckless conduct, and intentional acts); *La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc.,* 124 F.3d 10, 19 (1st Cir.1997) (same); *Energy XXI, GoM, LLC v. New Tech Eng'g,*

787 F.Supp.2d 590, 611 (S.D.Tex.2011) (same).

Because public policy was not at issue in *Becker,* and because *Houston Exploration* and *Todd Shipyards* concerned releases, not indemnities, this Court is free to decide this question.

■ This issue creates tension between two policies: freedom of contract, which weighs in favor of enforcing the indemnity, and a reluctance to encourage grossly negligent behavior, which weighs against enforcing the indemnity. *See, e.g., La Esperanza,* 124 F.3d at 19 (discussing these policy issues in the context of a release). The general rule is that competent persons have the utmost liberty of contracting, and therefore agreements voluntarily and fairly made are upheld. *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112 (1931). Although a contract can be invalidated on the grounds that it violates public policy, courts are instructed to apply this principle with caution and only in cases plainly within the reasons on which that doctrine rests, because the phrase "public policy" can be vague and variable. *Id.*

As to the argument that contractual indemnity for gross negligence contravenes public policy, it is significant that the Drilling Contract allocated risk to both Transocean and BP, not just BP. For example, Transocean admits that it bears liability for the deaths and injuries to its crew members and the loss of its equipment (namely, the DEEPWATER HORIZON) under Articles 21.1 and 22.2. (Transocean's Reply Br. to BP p. 7, Rec. Doc. 4867 at 8). With regards to pollution, Transocean assumed responsibility for pollution originat-

---

**10.** The court applied Louisiana law because neither party challenged the district court's conclusion that Louisiana law applied and because Louisiana law was the same as maritime law on that issue. *Houston Exploration Co.,* 269 F.3d at 531 n. 5.

ing at or above the water's surface in Article 24.1. Given these risk allocations, a grossly negligent act by Transocean could result in liability to Transocean as easily as it could have resulted in liability to BP. In other words, the reciprocal nature of these indemnity clauses arguably created an incentive for Transocean to avoid grossly negligent conduct, or at least did not encourage Transocean to act in a grossly negligent manner.[11] These considerations weaken the argument that the indemnity should be invalidated.

As to the "freedom of contract" argument, Transocean and BP appear to have held "roughly" equal bargaining power.[12] Transocean and BP are sophisticated entities that engaged in a potentially lucrative and obviously risky endeavor. The Drilling Contract reflects that they attempted to allocate risk ahead of time, ostensibly in the hopes that some degree of certainty may be brought to the risks inherent in that undertaking. *Cf.* Evans, *supra* note 11. Given that their bargaining power was roughly equal, the "freedom of contract" policy weighs in favor of upholding the indemnity.

Another point to be considered is that this indemnity clause does not leave an injured party without recourse, as would occur in a release. As discussed above, in a release the injured party is uncompensated for its injury (assuming it did not insure itself against the risk), because it has waived its cause of action against the wrongdoer. In an indemnity, the injured third party typically is not restrained from seeking compensation; rather, the source of the compensation is shifted to the indemnitor. Accordingly, the *Restatement (Second) of Contracts* states, "A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy," but then explains, "The rule stated in this Section does not apply to an agreement by a third person to indemnify a party against liability in tort." *Restatement (Second) of Contracts* § 195(1), cmt. (b) (updated 2011). Another treatise explains:

> [I]t has been said that "[i]ndemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury" *so that indemnification may be permitted when grossly*

---

11. *See* Christopher L. Evans, *Reciprocal Indemnification Agreements in the Oil Industry: The Good, the Bad and the Ugly*, 77 Def. Counsel J. 226, 228–29 (2010) ("When the liability of the parties involved is determined not by relative fault, but by the more random chance of who the person is that is injured, the parties are in a better position to work together on safety matters. Both parties have an equal incentive to make the work place safe for all, because either party can be responsible for an accident, even if it was not their fault. Further, the parties can work together to institute safety policies without concern that the party responsible for a particular safety policy will increase their relative responsibility for any potential liability that might arise if the safety policy they were responsible for is violated and someone is injured.").

12. To the extent bargaining power was not equal, Transocean was likely the weaker party. Transocean's brief notes that, in 2011, BP's market cap was $133 billion, compared to Transocean's $16 billion. (Transocean's Memo. in Supp. p. 2 n.b, Rec. Doc. 4477–1 at 26). Notably, the belief that oil companies, like BP, held unequal bargaining power over contractors motivated the Louisiana legislature to pass an act invalidating certain indemnity clauses in oil and gas contracts. *See Hodgen v. Forest Oil Corp.*, 115 F.3d 358, 359–360 (5th Cir.1997) (discussing La. R.S. 9:2780). Interestingly, here it is the oil company, not the contractor, that seeks to invalidate the indemnity. Regardless, this act does not apply; both parties argue that maritime law governs the Drilling Contract.

*negligent conduct was alleged and found.* Decisions with respect to these issues raise difficult policy concerns: On the one hand, the courts are, with good cause, reluctant to encourage wrongdoing by permitting the wrongdoer to be indemnified for misconduct. On the other hand, a refusal to permit indemnity will often, if not usually, result in an injury being unredressed by compensation. Balancing these competing interests is difficult and often results in subtle distinctions.

8 Richard A. Lord, *Williston on Contracts* § 19:20 (4th ed. updated 2011) (footnote omitted, emphasis added). Relying on this distinction, some non-maritime courts from other jurisdictions have held that indemnification for gross negligence does not violate public policy. *See, e.g. First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 341–42 (3d Cir.1983) (New Jersey law); *Austro v. Niagara Mohawk Power Corp.*, 66 N.Y.2d 674, 496 N.Y.S.2d 410, 487 N.E.2d 267, 267–68 (1985) (New York law).[13]

It is also significant that OPA, the primary federal legislation governing compensatory damages arising from oil pollution, expressly permits contractual indemnity for liability established under that Act, but is silent as to whether or not such indemnity may include gross negligence. *See* 33 U.S.C. § 2710.[14] However, in another Section OPA states that gross negligence will remove the limit of liability for removal costs and damages. *See* 33 U.S.C. § 2704(c)(1). The fact that gross negligence was plainly contemplated elsewhere in OPA, but *not* mentioned in Section 2710, tends to show that contractual indemnification for gross negligence is not inconsistent with OPA. Similarly, Section 2716(f)(1) states that a responsible party's "guarantor" may raise as a defense that the responsible party acted with "willful misconduct," but not gross negligence.[15] Al-

---

13. Two other cases did not express any hostility toward an indemnity that included to gross negligence, but admittedly, those cases did not address the public policy argument. *See In re Horizon Vessels, Inc.*, No. 03–3280, 2005 U.S. Dist. LEXIS 42110, *35–36 (S.D.Tex. Nov. 18, 2005) (Mag. Rec. & Order), *opinion adopted as modified*, 2005 U.S. Dist. LEXIS 42117 (S.D.Tex. Dec. 22, 2005) (maritime law); *Griffin v. Tenneco Oil Co.*, 625 So.2d 1090, 1096–97 (La.App. 4 Cir.1994) (Louisiana law). Still, these cases lend some additional support for the position that public policy does not prohibit indemnification for gross negligence. Furthermore, and as mentioned above, Louisiana Civil Code Article 2004 states that gross negligence will invalidate a release, but Revision Comment (e) states that Article 2004 does not apply to an indemnity contract.

14. Section 2710 states:

(a) Agreements not prohibited
Nothing in this Act prohibits any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this Act.

(b) Liability not transferred
No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer liability imposed under this Act from a responsible party or from any person who may be liable for an incident under this Act to any other person.
(c) Relationship to other causes of action
Nothing in this Act,· including the provisions of subsection (b) of this section, bars a cause of action that a responsible party subject to liability under this Act, or a guarantor, has or would have, by reason of subrogation or otherwise, against any person.

15. Section 2716(f)(1) states:

Subject to paragraph (2), a claim for which liability may be established under section 2702 of this title may be asserted directly against any guarantor providing evidence of financial responsibility for a responsible party liable under that section for removal costs and damages to which the claim pertains. In defending against such a claim, the guarantor may invoke—
. . .

though different policy concerns may govern an OPA guarantor, Section 2716(f)(1) serves as another indication that OPA is not opposed to indemnification for gross negligence.

■ For the above reasons, and in the absence of a binding rule to the contrary, the Court finds that *if* Transocean committed gross negligence that caused pollution originating below the surface of the water, public policy would not bar its claim for contractual indemnity from BP.[16] However, this holding is limited to compensatory damages, and does not include any punitive damages which might arise if Transocean is found grossly negligent.

■ In *Daughdrill v. Ocean Drilling & Exploration,* another judge from this court explained that the purpose of punitive damages would be defeated if the burden of such damages were shifted by contractual indemnity:

> The public policy purpose behind permitting [punitive] damages is to punish the defendant for egregious conduct, teaching him not to do it again, and to deter others from engaging in similar behavior....
>
> ... [I]n the case at bar we are confronted with contractual indemnification. No clearer example of a situation which would subvert the purposes of awarding punitive damages can be imagined than to permit such indemnification. To require a party, without recompense, to shoulder the burden of egregious conduct by another and hence permit that other to avoid punitive damage liability would make a mockery of the very con-

cept. In situations where the defendant's conduct is so extreme as to merit an award of punitive damages, the cost of such must be placed upon the party responsible, and not transferred to a party innocent of any wrongdoing. Accordingly, this Court feels that, even if indemnification is allowed, liability for punitive damages will not be compensible.

665 F.Supp. 477, 481–82 (E.D.La.1987) (citation omitted). The Court agrees with this reasoning and holds that Transocean's right to contractual indemnity does not extend to punitive damages.

### C. *Public Policy and CWA Penalties*

Similar to the argument regarding punitive damages, the United States and BP contend that contractual indemnity is unenforceable with respect to CWA penalties. Transocean, however, argues that CWA civil penalties are primarily remedial in nature, and therefore a CWA civil penalty may be shifted by contract. Transocean also argues that the CWA expressly allows contractual indemnification, *see* 33 U.S.C. § 1321(h), and to the extent this statute does not apply, indemnification is allowable under OPA, 33 U.S.C. §§ 2709, 2710.

Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7), imposes a civil penalty on "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility," from which a "harmful" quantity of oil discharges. Liability is strict, although gross negligence or willful misconduct will increase the

---

(C) the defense that the incident was caused by the willful misconduct of the responsible party.
The guarantor may not invoke any other defense that might be available in proceedings brought by the responsible party against the guarantor.

**16.** To the extent *Nexen Petroleum U.S.A., Inc. v. Sea Mar Division of Pool Well Services Co.,* 497 F.Supp.2d 787 (E.D.La.2007), holds to the contrary, the Court is not bound by, and declines to follow, that decision.

amount of the penalty. *See* 33 U.S.C. § 1321(b)(7)(D). In assessing the amount of a Section 311(b)(7) penalty, Courts are directed to

> consider the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.

33 U.S.C. § 1321(b)(8).

■ Legislative history and case law reveal that a Section 311(b)(7) civil penalty has multiple goals, including restitution, but the primary objectives are to punish and deter future pollution. For example, the House Conference Report on OPA (which also amended the CWA) stated, "Civil penalties [under the CWA] should serve primarily as an additional incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills." H.R.Rep. No. 101–653, Sec. 4301, at 52 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 833. In *Tull v. United States*, the Supreme Court analogized a civil penalty under Section 309(d) of the CWA, 33 U.S.C. § 1319(d)—which is similar in relevant aspects to Section 311(b)(7)—to punitive damages; i.e., those "remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo." 481 U.S. 412, 422 & n. 7, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (analyzing whether a claim for CWA penalties implicated the Seventh Amendment). The Court added, "The legislative history of the [CWA] reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties." *Id.* at 422, 107 S.Ct. 1831; *see also Kelly v. EPA*, 203 F.3d 519, 523 (7th Cir.2000) (citing *Tull*, 481 U.S. at 422–23, 107 S.Ct. 1831) ("Civil penalties under the [CWA] are intended to punish culpable individuals and deter future violations, not just to extract compensation or restore the status quo."); *Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111, 114 (2d Cir.1995) (stating that a penalty under CWA Section 311(b)(6), which is similar in many respects to Section 311(b)(7), "is not predicated upon the cost of removal, but upon the happening of the discharge. The determinative factor ... is the discharge of oil, not its cleanup," indicating that the primary purpose is deterrence); *United States v. Atlantic Richfield Co.*, 429 F.Supp. 830, 837 (E.D.Pa.1977) ("[T]he principal goal of [Section 311](b)(6) is to deter spills.... [T]he Congressional purpose here was to impose a standard of conduct higher than that related just to economic efficiency.... [E]ven where defendants are not at fault, the penalty does not act only as punishment but serves the ends of civil regulation."); *cf. United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1128 (5th Cir.1981) ("The purpose of [CWA Section 311] is to achieve the result of clean water as well as deter conduct causing spills." (citation and quotations omitted)); *United States v. Tex–Tow, Inc.*, 589 F.2d 1310, 1315 (7th Cir.1978) ("Tex–Tow's claim of irrationality is grounded in the assumption that the purpose of the civil penalty [in Section 311(b)(6) ] is to Deter spills.... [However,] the civil penalty *also* has certain non-deterrent, economic purposes ...." (emphasis added)). *But cf. United States v. Ward*, 448 U.S. 242, 249, 254, 100 S.Ct. 2636, 65 L.Ed.2d 742

(1980).[17] This indicates that, similar to punitive damages, public policy prohibits contractual indemnification for civil penalties under CWA Section 311(b)(7).

Furthermore, as mentioned above, assessing a CWA penalty requires a Court to consider factors such as the seriousness of the violation, the defendant's culpability, and the economic impact the penalty will have on the defendant. *See* 33 U.S.C. § 1321(b)(8). Thus, the penalty becomes somewhat "tailored" to the specific defendant and situation; an amount appropriate for one defendant might be ineffective (or grossly excessive) for another. *See Tull,* 481 U.S. at 422–23, 107 S.Ct. 1831. ("A court [assessing a penalty under Section 309(d) ] can require retribution for wrongful conduct based on the seriousness of the violations, the number of prior violations, and the lack of good-faith efforts to comply with the relevant requirements. It may also seek to deter future violations by basing the penalty on its economic impact." (citations omitted)). This feature would be undermined if a penalty tailored to discharger X is contractually shifted to Y. In such an instance, X, who may be culpable, avoids punishment (and by extension, is not deterred), while Y, who may be innocent of misconduct, is liable for a penalty that may be totally unsuited to it.

Transocean contends that Section 311(h), 33 U.S.C. § 1321(h), authorizes contractual indemnity for a CWA civil penalty. That Section provides:

> The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel or of an onshore facility or an offshore facility may have against any third party whose acts may in any way have caused or contributed to such discharge, or (2) The United States Government may have against any third party whose actions may in any way have caused or contributed to the discharge of oil or hazardous substance.

However, the Court interprets Section 311(h) as providing a right to equitable (as opposed to contractual) indemnity or contribution, given that it refers to rights against "any third party whose *acts* may in any way have *caused or contributed* to such discharge." Assuming *arguendo* that equitable indemnity applies to CWA civil penalties,[18] it does not follow that contractual indemnity also applies. Equitable and contractual indemnity are based on different concepts. Generally speaking, the former is based on the fault of a third party defendant, while the latter is based on an agreement (which may have nothing to do with the indemnitor's fault). *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* §§ 5–19, 5–21 (5th ed.2011).

---

**17.** In *Ward,* the Supreme Court stated, "We turn then to consider whether Congress, despite its manifest intention [in CWA Section 311(b)(6) ] to establish *a civil, remedial mechanism,* nevertheless provided for sanctions so punitive as to transfor[m] what was clearly *intended as a civil remedy* into a criminal penalty.... *Here* the penalty is *much more analogous to traditional civil damages."* 448 U.S. at 249, 254, 100 S.Ct. 2636 (emphasis added). However, at issue in *Ward* was whether Section 311(b)(6)—empowering the Secretary of the department in which the Coast Guard operates to impose a civil penalty for a harmful discharge—was *"so far crim-*inal in [its] nature"* as to trigger the Fifth Amendment's protection against self-incrimination. *Id.* at 253, 100 S.Ct. 2636 (emphasis added). In other words, the Court focused on whether Section 311(b)(6) was *so* punitive that it crossed the threshold between civil and criminal penalties. A very different question is presented here.

**18.** Whether a CWA penalty is subject to equitable indemnity is the subject of another motion pending before the Court. The Court does not rule on that issue here.

Thus, Section 311(h) does not support Transocean's position.[19]

Transocean also points to a note in the CWA that states, "Subsections (f), (g), (*h*), and (i) of section 311 of the [CWA] (33 U.S.C. 1321) shall not apply with respect to any incident for which liability is established under section [2702] of [OPA]," [20] and argues that Congress effectively substituted equitable indemnity in the CWA with contractual indemnity in OPA, 33 U.S.C. §§ 2709, 2710.[21] It appears the reason these CWA subsections are effectively repealed when OPA applies is because subsections (f), (g), and (i) concern removal costs, which is also addressed in Title I of OPA (and subject to different limits of liability). Thus, this note merely instructs that where *removal costs* could be sought under either OPA or the CWA, OPA's provisions apply. This note does not implicate a penalty under Section 311(b)(7) of the CWA. Moreover, the fact that removal costs, whether sought under the CWA or OPA, are subject to contractual indemnity is not surprising. Removal costs are intended to restore the status quo; they are remedial in nature. Thus, unlike a penalty that is primarily designed to deter certain conduct and punish the wrongdoer, it does not contravene public policy if removal costs are shifted by contract.

■ For these reasons, the Court holds that public policy invalidates the Drilling Contract's indemnity clause to the extent it includes civil penalties under Section 311(b)(7) of the CWA.

### D. *Breach of Contract, Acts that Materially Increase Indemnitor's Risk*

BP also argues that Transocean breached the Drilling Contract and/or acted in a way that materially increased BP's risk as indemnitor, which voided BP's indemnity obligation. BP contends Transocean "greatly increased the risk of a blowout by numerous acts, including not properly monitoring the well, failing adequately to train its crew, and providing a vessel with poorly maintained equipment." (BP Memo in Opp'n, p. 14, Rec. Doc. 4826 at 26).

It appears that breach of a contract can, in some circumstances, invalidate an indemnity clause. For example, in a case that applied New York law, the Fifth Circuit explained that where there is a breach of contract, the entire contract becomes void for mutuality: "[the indemnitee] would have no obligations under the contract; it could breach the contract in any way and to any extent and [the indemnitor] would be liable to itself! This interpretation would be ridiculous." *Mobil Chem. Co. v. Blount Bros. Corp.*, 809 F.2d 1175, 1182 (5th Cir.1987); *see also Marquette Transp. Co. v. La. Mach. Co.*, 367 F.3d 398, 408 (5th Cir.2004) ("If [the indemnitee] had been found to be in breach of [its warranty duties under the contract], perhaps our application of the indemnity clause would be different."). It has also been stated that "an act on the part of an indemnitee which materially increases the risk or prejudices the right of the indemnitor will discharge the indemnitor to the

---

**19.** For similar reasons, the Second Circuit's decision in *Montauk*, 54 F.3d at 114–15, also does not help Transocean.

**20.** OPA § 2002, Pub.L. No. 101–380, 104 Stat. 484, 506–07(codified as note to 33 U.S.C. § 1321) (emphasis added).

**21.** Section 2709 states, "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law. The action shall be brought in accordance with section 2717 of this title." Section 2710 is quoted in footnote 14.

extent that he has been damaged as a result of that act." *Gen. Ins. Co. of Am. v. Fleeger,* 389 F.2d 159, 161 n. 3 (5th Cir. 1968). However, not every breach of contract or act increasing the indemnitor's risk will void the indemnity. *See Becker,* 586 F.3d at 368–69 ("*Marquette [supra]* does not hold that breach of a contract necessitates invalidation of an indemnity agreement included therein."); 42 C.J.S. *Indemnity* § 61 (2011 update) ("However, an act or omission which, although in breach of some duty of the indemnitee, is not such as to increase the indemnitor's liabilities, or prejudice his or her rights and remedies, will not discharge him or her."). Circumstances may also exist where an indemnitee breached a term of the contract, but the indemnity obligation was not discharged because the indemnitor waived the breach. *See Jackson v. Lloyd Brasileirs Patrimonio Nacional,* 324 F.Supp. 556, 561–62 (S.D.Tex.1970).

■ Article 25.1 of the Drilling Contract, which is incorporated into Article 24.2, required BP to indemnify Transocean, "without regard to the cause or causes thereof, including ... breach of representation or warranty [or] ... breach of contract...." It does not appear that the cases cited above had to consider such language. Perhaps it is possible that a breach of a fundamental, core obligation of the contract could invalidate this indemnity clause, but it is speculative to discuss at this stage what sort of breach would cause that result, or whether such a breach occurred. BP's arguments appear doubtful at this stage, but the Court cannot resolve these issues here. *See In re Torch, Inc.,* 1996 WL 185765 at *10 ("Torch argues TEPI breached their contract [which voids the indemnity agreement].... Whether these duties exist; whether they have been breached; and whether such a [breach] would have an effect on the duty to indem-

nify present questions of fact which preclude summary judgment.").

### E. Attorney Fees Incurred in Enforcing a Right to Indemnity, Duty to Defend

Transocean also requests that BP be required to reimburse Transocean's attorneys' fees, costs, and expenses incurred in (1) defending environmental claims for which BP is contractually obligated and (2) enforcing its right to indemnity from BP. It argues that when the allegations of a complaint reflect that at least some of the claims will fall within the scope of the duty to defend, the duty to defend arises, and this duty is independent of and broader than the duty to indemnify. BP counters that its duty to defend is co-extensive with the duty to indemnify and only requires BP to reimburse Transocean if it is found entitled to indemnification at the conclusion of trial.

■ Transocean's second request is considered first. Parties can expressly agree that the expense of proving indemnification is within the scope of indemnity, *see Peter Fabrics, Inc. v. S.S. Hermes,* 765 F.2d 306, 316 (2d Cir.1985) (citing *E.C. Ernst, Inc. v. Manhattan Constr. Co.,* 551 F.2d 1026, 1037 (5th Cir.1977)); however, "[u]nder a general indemnity agreement ..., the indemnitee enjoys no right to recover its legal fees incurred in establishing its right to indemnification," *Weathersby v. Conoco Oil Co.,* 752 F.2d 953, 959 (5th Cir.1984) (per curiam) (citations and quotations omitted); *see also Tullos v. Cal Dive Int'l,* 188 F.Supp.2d 709, 714 (S.D.Tex.2002); 41 Am.Jur.2d *Indemnity* § 30 (2011 update). The indemnity clause in *Weathersby* stated:

A. Company [Conoco] agrees to indemnify and hold harmless Contractor [Global Marine] ... against any and all claims, demands or suits ... which may

be brought against Contractor ... by any employee of Company ...

...

C. Subject only to Section XIII (Uninsured Risks), Contractor shall *protect,* indemnify, and save Company harmless from and against all claims, demands, and causes of action of every kind and character (*including cost of defense* ) for injury to or death of all persons who are not employees of Company or employees of Contractor under [Section A] above ...

*Weathersby,* 752 F.2d at 954–55 (emphasis added). The court held this language did not entitle the indemnitee to recover the expense of proving its right to indemnification. Similarly, the Second Circuit held that the phrase "including but not limited to cost of suit and attorneys' fees," does not include the cost of establishing the right to indemnity. *Peter Fabrics, Inc.,* 765 F.2d at 316 (2d Cir.1985) ("[T]hese words are more naturally construed as referring to legal expenses incurred in defending against the primary claim.").

 Article 25.1 of the Drilling Contract states, in pertinent part:

25.1 *INDEMNITY OBLIGATION*

... THE PHRASE "SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS" MEANS THAT THE INDEMNIFYING PARTY *SHALL PROTECT,* RELEASE, *DEFEND,* INDEMNIFY, AND HOLD HARMLESS THE INDEMNIFIED PARTY OR PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, COSTS, EX-PENSES (*INCLUDING REASONABLE ATTORNEYS FEES* ), JUDGMENTS AND AWARDS OF ANY KIND OR CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF....

This language is similar to that considered in *Weathersby* and *Peter Fabrics.* Accordingly, Transocean cannot recover the attorney's fees, costs, and expenses it incurred to establish its right to indemnification from BP.

As to Transocean's first request, the issue is whether the Drilling Contract requires BP, at the start of the litigation process, to assume the cost of Transocean's defense against pollution claims when it is possible that some or all of the claims will fall outside indemnity (e.g., the United States' claim for CWA penalties). There appear to be no maritime cases directly addressing this issue.[22] Looking to other jurisdictions, some courts treat the duty to defend in a contractual indemnity the same as a duty to defend in an insurance contract, and hold that the duty arises when the pleadings disclose that some of the claims fall within the scope of the indemnity. *E.g., English v. BGP Intern., Inc.,* 174 S.W.3d 366, 372 & n. 6 (Tex.Ct.App.2005) ("The duty to defend is determined solely by the precise language in the contract and the factual allegations in the pleadings.... [W]e find little reason why the principles regarding an insurer's duty to defend should not apply with equal force to an indemnitor's contractual promise to defend its indemnitee."); *accord Westlake Vinyls, Inc. v. Goodrich Corp.,*

---

**22.** In *Clement v. Marathon Oil Co.,* the court granted a motion for summary judgment and held that an indemnitor "should have assumed [the indemnitee's] defense based on the contract and the pleadings." 724 F.Supp. 431, 433 (E.D.La.1989). However, there the plaintiff's claims against the indemnitee were dismissed prior to summary judgment, so it appears there was no question as to whether the claims would fall within the scope of indemnity coverage, as there is here.

518 F.Supp.2d 918, 936 (W.D.Ky.2007) (applying Ohio law). Other jurisdictions conclude that a contractual indemnitor's duty to defend is narrower than an insurer's duty to defend. *E.g., Grand Trunk W. R.R. v. Auto Warehousing Co.,* 262 Mich. App. 345, 686 N.W.2d 756, 762 (Mich.Ct. App.2004) ("Unlike in the insurance context, defendant's duty to defend is not separate and distinct from the duty to indemnify, and the court erred in so holding.... [T]he duty to defend is not absolute ...."); *accord Meloy v. Conoco,* 504 So.2d 833, 839 (La.1987).

Although insurance contracts are a type of indemnity contract, they are governed by different rules. *See Castleberry v. Goldome Credit Corp.,* 418 F.3d 1267, 1273 (11th Cir.2005); *Meloy,* 504 So.2d at 839 & n. 10. The purpose of an insurance contract is to distribute risk of loss across a large group. *Castleberry,* 418 F.3d at 1272. These contracts are usually not negotiated, thus any ambiguities are construed in favor of the insured. *Id.* By contrast, an indemnity clause contained in a non-insurance contract is construed against coverage, because the agreement creates duties that differs or extends beyond those established by general principles of law. *Castleberry,* 418 F.3d at 1272. Such clauses are typically collateral or incidental to a contract that has a principal purpose other than risk shifting. *Id.* In light of these differences, the Court does not automatically apply insurance rules to the duty to defend in the Drilling Contract.

While a contract certainly could express that the duty to defend is broader than indemnity, such intent is not expressed here. Article 25.1 lists the duty to defend in the same sentence as the duty to indemnify. This reflects that the duties to defend and indemnify are to be treated identically. Because these duties are co-extensive, and the extent to which Trans-

ocean is owed indemnity is not entirely clear at the moment, the scope of the duty to defend also cannot be determined now. Accordingly, BP's duty to defend only requires it to reimburse Transocean's defense costs after there has been judicial determination on the merits.

## IV. *SUMMARY*

In summary, the Court finds as follows:

1. Subject to the provisions below, BP is required to indemnify Transocean for compensatory damages asserted by third parties against Transocean related to pollution that did not originate on or above the surface of the water, even if the claim is the result of Transocean's strict liability (including OPA and unseaworthiness), negligence, or gross negligence. The Court does not express an opinion as to whether Transocean will be held strictly liable, negligent, or grossly negligent.

2. BP does not owe Transocean indemnity to the extent Transocean is held liable for punitive damages. The Court does not express an opinion as to whether Transocean will be liable for punitive damages.

3. BP does not owe Transocean indemnity to the extent Transocean is held liable for civil penalties under Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7). The Court does not express an opinion as to whether Transocean will be liable for such penalties.

4. The Court defers ruling on BP's arguments that Transocean breached the Drilling Contract or committed an act that materially increased BP's risk or prejudiced its rights.

5. BP's duty to defend does not include the expenses Transocean has in-

curred or will incur in proving its right to indemnity.

6. BP is not obligated to fund Transocean's defense against third party claims at this time.

Accordingly,

**IT IS ORDERED** that Transocean's Motion for Partial Summary Judgment (Rec. Doc. 4477) and BP's Cross–Motion for Partial Summary Judgment (Rec. Doc. 4827) are **GRANTED IN PART** and **DENIED IN PART,** as set forth above.